UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ANITA ROJAS-GONZALEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>    Defendant. | No. CV 13-7111-PLA<br><br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on October 3, 2013, seeking review of the Commissioner's denial of her application for Disability Insurance Benefits. The parties filed Consents to proceed before the undersigned Magistrate Judge on November 4, 2013, and November 8, 2013. Pursuant to the Court's Order, the parties filed a Joint Stipulation on June 18, 2014, that addresses their positions concerning the disputed issue in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## **BACKGROUND**

Plaintiff was born on July 26, 1961. [Administrative Record ("AR") at 23, 75.] She has a sixth grade education, and past relevant work experience as a uniform attendant. [AR at 62, 90.]

On May 19, 2010, plaintiff filed an application for Disability Insurance Benefits, alleging that she has been unable to work since October 22, 2007. [AR at 82, 192-95.] After her application was denied initially, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 97-102.] An initial hearing was held on July 6, 2011, at which time plaintiff appeared with counsel and testified on her own behalf. [AR at 55-74.] A supplemental hearing was held on December 20, 2011, at which time plaintiff again appeared with counsel and testified on her own behalf. [AR at 19-55.] A vocational expert ("VE") also testified. [AR at 43-50.] On January 24, 2012, the ALJ determined that plaintiff was not disabled. [AR at 82-92.] Plaintiff subsequently requested review of the ALJ's decision with the Appeals Council. [AR at 14-15.] When the Appeals Council denied plaintiff's request for review on July 30, 2013, the ALJ's decision became the final decision of the Commissioner. [AR at 1-9]; see Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam). This action followed.

## III.

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (internal quotation marks and citation omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same). When determining whether substantial evidence exists to support the

2

Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (internal quotation marks and citation omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.").

## IV.

## **THE EVALUATION OF DISABILITY**

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

**A.    THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires

the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since her alleged disability onset date, October 22, 2007.[1] [AR at 84.] At step two, the ALJ concluded that plaintiff has the following severe combination of impairments: "status post carpal tunnel release on the right"; "gastroesophageal reflux disease"; "disc protrusions in the cervical spine and lumbar spine"; "sleep apnea by history"; and "obesity." [AR at 84-85.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listings.[2] [AR at 85.]

---

[1]   The ALJ determined that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2012. [AR at 84.]

[2]   See 20 C.F.R. pt. 404, subpt. P, app. 1.

4

The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. §§ 404.1567(b).[4] [AR at 87.] Specifically, the ALJ determined:

> [plaintiff] can lift and/or carry [twenty] pounds occasionally and [ten] pounds frequently, stand and/or walk (with normal breaks) six hours in an eight-hour day, and sit (with normal breaks) six hours in an eight-hour day. She should never climb ladders, ropes or scaffolds. In addition, she can no more than frequently handle and finger bilaterally.

[AR at 87.] At step four, based on plaintiff's RFC and the VE's testimony, the ALJ concluded that plaintiff is capable of performing her past relevant work as a uniform attendant. [AR at 90.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from October 22, 2007, through the date of the decision. [AR at 92.]

## V.

## **THE ALJ'S DECISION**

In the Joint Stipulation, plaintiff argues that the ALJ improperly evaluated the opinion of her treating physicians. [JS at 4-8, 11-12.] For the reasons discussed below, the Court agrees with plaintiff and remands for further proceedings.

/

/

/

---

[3] RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b) & 416.967(b).

**EVALUATION OF MEDICAL EVIDENCE**

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for rejecting her treating physicians' opinions. [JS at 4-8, 11-12.] Specifically, plaintiff posits that the issue "is whether the ALJ properly evaluated the opinions of Drs. Giacobetti and Ashley." [JS at 7.][5]

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Carmickle, 533 F.3d at 1164 (internal quotation marks and citation omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164 (internal quotation marks and citation omitted); Ryan, 528 F.3d at 1198. The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, 157 F.3d at 725. The ALJ "must set forth his own interpretations and explain why they, rather than the [treating] doctors', are correct." Id.

In a "Supplemental Report" dated June 26, 2006, Dr. Edwin Ashley reported that plaintiff "underwent [an] EMG/nerve conduction velocity test," and diagnosed plaintiff with "[b]ilateral carpal and cubital tunnel syndromes." [AR at 330-31.] On August 15, 2006, Dr. Ashley diagnosed

---

[5] The ALJ, in his opinion, identifies Dr. Giacobetti as "a physician in connection with the claimant's workers' compensation claim." [AR at 90.] Both of Dr. Giacobetti's reports are referred to as "treating physician's" reports. [AR at 342-47.]

plaintiff with carpal tunnel syndrome, right, and recommended, among other things, that plaintiff undergo a carpal tunnel release. [AR at 335.] In a Supplemental Report dated December 11, 2006, Dr. Ashley diagnosed plaintiff with "[b]ilateral carpal tunnel syndrome," and indicated that plaintiff "has failed conservative treatment." [AR at 326.] Dr. Ashley wrote that he believed plaintiff "would benefit from a carpal tunnel release on an outpatient basis." [Id.]

In an initial orthopedic evaluation dated November 2, 2007, Dr. Frank B. Giacobetti conducted a physical examination of plaintiff, finding, among other things, "tenderness over the wrist," but "no atrophy of intrinsic or thenar muscles." [AR at 344-45.] Dr. Giacobetti indicated that he planned to request EMG nerve test results, and that he would recommend an MRI to the bilateral wrist "to rule out internal derangement." [AR at 346.]

In an initial evaluation report dated November 9, 2007, Dr. Ashley diagnosed plaintiff with "[b]ilateral [c]arpal tunnel syndrome" and "[b]ilateral cubital tunnel syndrome." [AR at 407.] On December 14, 2007, Dr. Ashley diagnosed plaintiff with bilateral carpal tunnel syndrome and "[r]ight cubital tunnel syndrome," and wrote that he was "requesting authorization to perform a right cubital tunnel release as well as right and left carpal tunnel releases on a sequential basis." [AR at 395.]

On December 21, 2007, Dr. Giacobetti examined plaintiff's right hand and wrist, and noted "[b]ilateral tinels sign for carpal tunnel syndrome." [AR at 342-43.] Dr. Giacobetti's "impression" included "[m]ild cubital tunnel syndrome, left," "[m]ild carpal tunnel syndrome, left," "[s]evere carpal tunnel syndrome, right," and "[b]ilateral flexor tendonitis." [AR at 343.] He opined that plaintiff was limited to "[m]odified duty work with no lifting greater than [five] pounds with no forceful gripping and grasping." [Id.]

In reports dated January 25, 2008, and February 29, 2008, Dr. Ashley diagnosed plaintiff with "[b]ilateral [c]arpal tunnel syndrome," and "[r]ight [c]ubital tunnel syndrome." [AR at 390, 392.] On February 29, 2008, he additionally issued a report in which he repeated his diagnoses of bilateral carpal tunnel syndrome and right cubital tunnel syndrome, explaining that a physical examination of plaintiff's bilateral hands revealed positive Tinel's test, positive Phalen's test, and decreased sensation in the ring and small fingers. [AR at 388.] He also indicated that physical

7

1   examination of plaintiff's right elbow revealed positive Tinel's test "over the medial aspect of the
2   elbow," and that plaintiff "is scheduled to undergo a right carpal tunnel release." [Id.][6]

3   In various treatment notes dating from March 28, 2008, through August 8, 2008, Dr. Ashley repeatedly diagnosed plaintiff with "[status post] right [c]arpal tunnel syndrome release 03/21/2008," "[l]eft [c]arpal tunnel syndrome," and "[r]ight [c]ubital tunnel syndrome." [See AR at 373, 377, 379, 381, 383-84.][7] In his objective findings in examinations on May 19, 2008, and June 27, 2008, Dr. Ashley reported that plaintiff was "not able to make a full fist with right hand." [AR at 379, 381.]

9   Plaintiff underwent a right cubital tunnel release, performed by Dr. Ashley, on August 22, 2008. [AR at 421.]

11  In approximately-monthly Progress Reports dating from August 29, 2008, through November 21, 2008, Dr. Ashley repeatedly diagnosed plaintiff with "[b]ilateral [c]arpal tunnel syndrome," and "[r]ight [c]ubital tunnel release 8-22-08." [AR at 364, 366, 368, 370.] He indicated that plaintiff should "[r]emain off work" through January 9, 2009, and recommended occupational and physical therapy. [AR at 364, 366, 368, 370.]

16  In an "Initial Orthopaedic Consultation" dated December 16, 2008 [AR at 1010-69], Agreed Medical Examiner Dr. Richard M. Siebold conducted physical and neurological examinations of plaintiff, as well as an "x-ray review," and a review of outside records, and assessed plaintiff with regard to her cervical spine and upper extremities (opining functional restrictions including "no very repetitive motion cervical spine with no forceful activities bilateral upper extremities") and her lumbar spine. [AR at 1063-66.]

---

[6] An "Operative Report" dated March 21, 2008, indicates that plaintiff did undergo a right carpal tunnel release procedure on that date. [AR at 631.]

[7] In an "Orthopedic Re-Evaluation and Request for Surgical Authorization," dated June 27, 2008, Dr. Ashley additionally indicated that he was "requesting authorization to perform a right cubital tunnel release and a medial epicondylectomy as [plaintiff] has failed all conservative treatment." [AR at 377.]

8

In a Progress Report dated January 9, 2009, Dr. Ashley repeated his diagnoses of "[b]ilateral [c]arpal tunnel syndrome," and "[r]ight [c]ubital tunnel release 8-22-08." [AR at 362.] He indicated that plaintiff would continue in physiotherapy "as medical[ly] necessary." [Id.]

On February 7, 2009, Dr. Siebold, having reviewed "[f]urther outside records," issued a "Special Supplemental AME Report." [AR at 992-1004.] He indicated that "[f]unctional restrictions for the cervical spine at this time based on multilevel disc disease would include no repetitive motion and no prolonged positioning for the cervical spine." [AR at 996.] Dr. Siebold opined work restrictions with regard to "the bilateral upper extremities" as including "no forceful activities right or left upper extremity based on the abnormal nerve studies at the elbow and wrist." [Id.] With regard to plaintiff's lumbar spine, Dr. Siebold opined restrictions including "no very heavy work," with "no repetitive stooping or bending." [AR at 997.]

In Progress Reports dated February 20, 2009, and April 3, 2009, Dr. Ashley repeated his diagnoses of bilateral carpal tunnel syndrome and right cubital tunnel release, and noted "decreased sensation to light touch on the distal right/ left median/ ulnar nerve distribution" and "positive Phalen's test and positive Tinel's on right/left." [AR at 358, 360.] Also on April 3, 2009, Dr. Ashley diagnosed plaintiff with status post right carpal tunnel release with recurrent symptoms, left carpal tunnel syndrome, and status post right cubital tunnel release, and reported that plaintiff "has reached maximum medical improvement and can be considered permanent and stationary." [AR at 348-52.] He also opined that plaintiff is "prohibited from lifting over [ten pounds] and repetitive gripping and grasping." [AR at 351.]

In a "Comprehensive AME Reexamination" performed on February 10, 2010 [AR at 437-77], Dr. Siebold opined that plaintiff's disability status is "[p]ermanent and [s]tationary" with regard to her cervical spine and her bilateral upper extremities. [AR at 469-70.] He further opined restrictions with regard to plaintiff's cervical spine to include "no very repetitive motion" with "no very prolonged positioning," and "no very heavy lifting at or above shoulder level." [AR at 468.] With regard to plaintiff's bilateral upper extremities, Dr. Siebold considered plaintiff to be permanent and stationary, and opined that plaintiff was restricted to "no forceful activities bilaterally." [AR at 470.] He also opined that plaintiff "has subjective complaints that are

In a Progress Report dated January 9, 2009, Dr. Ashley repeated his diagnoses of "[b]ilateral [c]arpal tunnel syndrome," and "[r]ight [c]ubital tunnel release 8-22-08." [AR at 362.] He indicated that plaintiff would continue in physiotherapy "as medical[ly] necessary." [Id.]

On February 7, 2009, Dr. Siebold, having reviewed "[f]urther outside records," issued a "Special Supplemental AME Report." [AR at 992-1004.] He indicated that "[f]unctional restrictions for the cervical spine at this time based on multilevel disc disease would include no repetitive motion and no prolonged positioning for the cervical spine." [AR at 996.] Dr. Siebold opined work restrictions with regard to "the bilateral upper extremities" as including "no forceful activities right or left upper extremity based on the abnormal nerve studies at the elbow and wrist." [Id.] With regard to plaintiff's lumbar spine, Dr. Siebold opined restrictions including "no very heavy work," with "no repetitive stooping or bending." [AR at 997.]

In Progress Reports dated February 20, 2009, and April 3, 2009, Dr. Ashley repeated his diagnoses of bilateral carpal tunnel syndrome and right cubital tunnel release, and noted "decreased sensation to light touch on the distal right/ left median/ ulnar nerve distribution" and "positive Phalen's test and positive Tinel's on right/left." [AR at 358, 360.] Also on April 3, 2009, Dr. Ashley diagnosed plaintiff with status post right carpal tunnel release with recurrent symptoms, left carpal tunnel syndrome, and status post right cubital tunnel release, and reported that plaintiff "has reached maximum medical improvement and can be considered permanent and stationary." [AR at 348-52.] He also opined that plaintiff is "prohibited from lifting over [ten pounds] and repetitive gripping and grasping." [AR at 351.]

In a "Comprehensive AME Reexamination" performed on February 10, 2010 [AR at 437-77], Dr. Siebold opined that plaintiff's disability status is "[p]ermanent and [s]tationary" with regard to her cervical spine and her bilateral upper extremities. [AR at 469-70.] He further opined restrictions with regard to plaintiff's cervical spine to include "no very repetitive motion" with "no very prolonged positioning," and "no very heavy lifting at or above shoulder level." [AR at 468.] With regard to plaintiff's bilateral upper extremities, Dr. Siebold considered plaintiff to be permanent and stationary, and opined that plaintiff was restricted to "no forceful activities bilaterally." [AR at 470.] He also opined that plaintiff "has subjective complaints that are

somewhat out of proportion to the objective findings," that plaintiff "gave [zero] grip strength readings in spite of a lack of atrophy of the upper extremities" and that he did not believe that plaintiff "gave maximum effort." [AR at 471.] With regard to her lumbar spine, Dr. Siebold considered plaintiff to be permanent and stationary, and opined, "based on a minor disc bulge," that plaintiff was restricted to "no very heavy lifting," and "no repetitive stooping or bending." [AR at 472.][8]

On September 30, 2010, a nonexamining physician completed a Physical Residual Functional Capacity Assessment of plaintiff and opined that plaintiff was limited to lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking with normal breaks for a total of "about [six] hours in an [eight]-hour workday[;]" sitting with normal breaks for a total of "about [six] hours in an [eight]-hour workday[;]" pushing and/or pulling, including operation of hand/foot controls, but "limited in upper extremities[;]" occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; "occasion[ally]" handling ("gross manipulation") and fingering ("fine manipulation"); occasionally reaching overhead with upper extremities; and additionally indicated that plaintiff must "avoid concentrated exposure" to hazards ("machinery, heights, etc."). [AR at 794-99.] The nonexamining doctor also assigned an RFC for light work "[with occasional] limitations to overhead reaching, fine and gross manipulations." [AR at 798.]

In a summary report of an internal medicine evaluation dated August 3, 2011, examining physician Dr. Rocely Ella Tamayo diagnosed plaintiff with "[s]tatus post carpal tunnel release two times on the right, with residual pain and limitation of motion of the right[;]" "[h]istory of neck and low back pain[;]" and "[b]ilateral shoulder pain." [AR at 862.] Dr. Tamayo opined that plaintiff is "able to lift 20 pounds occasionally and 10 pounds frequently because of her shoulder and right hand condition," able to "stand and walk six out of an eight-hour work period with normal breaks," and able to "kneel, squat and sit without restrictions." [Id.]

---

[8] Dr. Siebold repeated substantially the same diagnoses and opinions on July 17, 2010. [AR at 928-46.]

10

In his decision, the ALJ gave "great weight to the assessment of [examining] consultative orthopedist," Dr. Tamayo, which he found to be "generally consistent" with the opinion of Dr. Siebold, as expressed in his February 10, 2010, opinion. [AR at 90.] The ALJ gave "less weight" to the December 21, 2007, opinion of Dr. Giacobetti that plaintiff "could perform modified duty work with no lifting greater than [five] pounds and no forceful gripping and grasping." [Id.; see also AR at 342-43.] The ALJ also gave "less weight" to Dr. Ashley's April 3, 2009, opinion[9] that plaintiff was "prohibited from lifting over [ten] pounds and engaging in repetitive gripping and grasping." [AR at 90; see also AR at 351.] The ALJ explained that he assigned "less" weight to these opinions because "these workers' compensation physicians[] assess limitations they feel existed at certain points through the course of the claimant's treatment. I find the opinions of the examination orthopedist and the agreed medical examiner far more persuasive." [AR at 90.]

Under the circumstances, the reason provided by the ALJ for giving little weight to the opinions of Dr. Ashley and Dr. Giacobetti is not legally sufficient and/or supported by substantial evidence. [AR at 17-18.] As an initial matter, even assuming the opinion of the examining physician (Dr. Tamayo) constituted "substantial evidence," the Social Security regulations still require deference to the treating physicians' opinions. See 20 C.F.R. § 404.1527; Social Security Ruling ("SSR") 96-2p,[10] 1996 WL 374188, at *1 ("A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected."); Orn v. Astrue, 495 F.3d 625, 633 (9th Cir. 2007) ("Even if [the examining physician's] opinion were 'substantial evidence,' § 404.1527 still requires deference to the treating physicians' opinions"). Under 20 C.F.R. §§ 404.1527, the Commissioner looks at the following factors in determining the weight to

---

[9] The ALJ referred to Dr. Ashley as "another workers' compensation physician," without acknowledging Dr. Ashley's relationship to plaintiff as her treating physician or as the surgeon who performed two surgical procedures on plaintiff. [AR at 90.]

[10] "The Commissioner issues Social Security Rulings [("SSRs")] to clarify the Act's implementing regulations and the agency's policies. SSRs are binding on all components of the [Social Security Administration]. SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (internal citations omitted).

be given to the treating physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination[,]" and (2) the "[n]ature and extent of the treatment relationship[]" between the patient and the treating physician. Id. at §§ 404.1527(c)(2)(i)-(ii). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." Orn, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(c)(3)-(6)) (brackets in original).

Under the factors set forth in § 404.1527, the ALJ erred in affording less weight to the opinion of plaintiff's treating physician, as the treating relationship that Dr. Ashley had with plaintiff provides a "unique perspective" on plaintiff's condition. See 20 C.F.R. § 404.1527(c)(2); Orn, 495 F.3d at 633. Specifically, the nature and extent of Dr. Ashley's relationship with plaintiff adds significant weight to his opinion. See 20 C.F.R. § 404.1527(c)(2)(i)-(ii); Orn, 495 F.3d at 633. Dr. Ashley maintained an ongoing treating relationship with plaintiff through approximately-monthly examinations over a three-year period, including recommending and performing two surgical procedures. [See AR at 325-422, 631-32.]

The "[s]upportability" of Dr. Ashley's opinion adds further weight. See 20 C.F.R. § 404.1527(c)(3). When viewed in their entirety, the records from Dr. Ashley provide ample support for his opinion regarding plaintiff's functional limitations. [See, e.g., AR at 392 (progress report dated January 25, 2008, in which Dr. Ashley reported that plaintiff has "[m]oderate/[s]evere right [c]arpal tunnel syndrome, mild left [c]arpal tunnel syndrome, mild right [c]ubital tunnel syndrome"), 376-77 (request for surgical authorization dated June 27, 2008, in which Dr. Ashley noted that there is "positive Tinel's test over the medial aspect" of plaintiff's right elbow and "decreased sensation in the ring and small finger" of plaintiff's right hand), 379 (progress report dated June 27, 2008, in which Dr. Ashley reported that plaintiff is "not able to make a full fist with right hand").]

The "consistency" of plaintiff's treating physician's opinion with the record as a whole merits additional weight. See 20 C.F.R. § 404.1527(c)(4); Orn, 495 F.3d at 634. Dr. Ashley's opinion is supported by other medical evidence in the record. [See, e.g., AR at 343 (medical report dated December 21, 2007, in which Dr. Giacobetti reported that an EMG nerve test revealed "severe carpal tunnel syndrome with mild left carpal tunnel syndrome and mild cubital tunnel syndrome"), 432 (Report of Electromyogram dated January 16, 2009, in which Dr. Jurkowitz, a neurologist, reported that an EMG and nerve conduction study revealed evidence of "mild compression or dysfunction of both ulnar nerves at the elbow with denervation," and "mild-to-moderate compression or dysfunction of both median nerves at the wrist with a possible mild-to-moderate carpal tunnel syndrome bilaterally"), 674 (Internal Medicine Permanent and Stationary Report dated August 28, 2009, in which Dr. Glenn A. Marshak diagnosed plaintiff with "[b]ilateral [c]arpal tunnel syndrome," among other things).]

Moreover, the Court is persuaded that the ALJ failed to provide specific and legitimate reasons for rejecting the opinions of Dr. Ashley and Dr. Giacobetti. As an initial matter, to the extent defendant claims both physicians' opinions are contradicted by the opinion of Dr. Richard Siebold [JS at 10-11], the ALJ did not provide this as a reason for rejecting either physician's opinion. "Long-standing principles of administrative law require [this Court] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ -- not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225–26 (9th Cir.2009) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)). However, even if the ALJ had found that Dr. Ashley's opinion was contradicted, the ALJ is nevertheless required to provide "specific and legitimate reasons that are supported by substantial evidence in the record" for rejecting a physician's opinion. Carmickle, 533 F.3d at 1164 (internal quotation marks and citation omitted). The ALJ failed to do so.

The only reason given by the ALJ for discrediting Dr. Ashley's and Dr. Giacobetti's opinions was that "[t]hese worker's compensation physicians[] assess limitations they feel existed at certain points through the course of [plaintiff's] treatment." [AR at 90.] This is not a clear and convincing reason for rejecting plaintiff's treating physicians. Specifically, the ALJ may not devalue a treating

13

physician's opinion solely because it was given in a state worker's compensation setting. See Booth v. Barnhart, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002) ("[T]he ALJ may not disregard a physician's medical opinion simply because it was initially elicited in a state workers' compensation proceeding, or because it is couched in the terminology used in such proceedings."); see also Coria v. Heckler, 750 F.2d 245, 248 (3d Cir. 1984) ("[T]he ALJ should evaluate the objective medical findings set forth in the medical reports for submission with the worker's compensation claim by the same standards that s/he uses to evaluate medical findings in reports made in the first instance for the Social Security claim, unless there is some reasonable basis to believe a particular report or finding is not entitled to comparable weight."). The ALJ's general language here, which appears to relate to <u>all</u> medical evidence originating in workers' compensation proceedings, fails to include any specific reason for his decision to discount the evidence in <u>this</u> case. [AR at 90.][11]

Moreover, despite noting the "adversarial" nature of workers' compensation proceedings, the ALJ pointed to no evidence in the record to support a finding of bias or impropriety on the part of either Dr. Ashley or Dr. Giacobetti. See Lester, 81 F.3d at 832 ("The Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits."); Reddick, 157 F.3d at 725-26 (ALJ erred in assuming that the treating physician's opinion was less credible because his job was to be supportive of the patient).

Next, although the ALJ asserts that Dr. Ashley's and Dr. Giacobetti's opinions reflect limitations that "they feel existed at certain points through the course of [plaintiff]'s treatment," the

---

[11] In his assessment at step two of the sequential analysis, the ALJ observed that "the vast majority of the medical records submitted in this case are reports prepared in the context of the workers' compensation claim system," and specifically noted that that system "is adversarial in nature," and that "the definition of 'disability' [in that setting] is not the same as [the definition used in] a Social Security case." [AR at 87-88.] To the extent the ALJ may have found that any of the terms used by plaintiff's treating physicians required translation from the workers' compensation context -- including the term "repetitive," as discussed infra -- he was required to at least indicate that he "recognized the differences between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand, and [that he] took those differences into account in evaluating the medical evidence." Booth, 181 F. Supp. at 1106. He cannot simply reject an opinion based on it being provided in a workers' compensation context.

ALJ fails to explain how Dr. Ashley's opinion, based on examinations of plaintiff on approximately twenty separate occasions over the course of approximately three years, is less "persuasive" than the opinions of the examining physician, whose opinion is truly based on her examination of plaintiff at a single point in time. [AR at 90; see also AR at 325-422, 631-32, 858-62.]

In sum, the ALJ failed to provide specific and legitimate reasons for rejecting plaintiff's treating physician's opinions.[12] As a result, the ALJ's decision is not supported by substantial evidence and remand is required.

## VI.

## **REMAND FOR FURTHER PROCEEDINGS**

The Court has discretion to remand or reverse and award benefits. McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. See Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004). Where there are outstanding issues that must

---

[12] The ALJ's error in rejecting plaintiff's treating physicians' opinions cannot be considered harmless because at least one of the limitations opined by Dr. Ashley -- prohibition from "repetitive gripping and grasping" -- was not included in the hypotheticals posed to the VE. [Compare AR at 43-50, with AR at 351.] The Ninth Circuit has discussed (in dictum) that the use of the word "repetitive" in this context "refer[s] to a qualitative characteristic -- i.e., how one uses his hands, or what type of motion is required -- whereas 'constantly' and 'frequently' seem to describe a quantitative characteristic -- i.e., how often one uses his hands in a certain manner. Under this reading, a job might require that an employee use his hands in a repetitive manner frequently, or it might require him to use his hands in a repetitive manner constantly." Gardner v. Astrue, 257 Fed.Appx. 28, 30 & n. 5 (9th Cir. 2007) (emphasis in original) (citable for its persuasive value pursuant to Ninth Circuit Rule 36-3). The VE testified that an individual with limitations including "no forceful gripping or grasping" [AR at 48], occasional "handling and fingering bilaterally" [AR at 49], or preclusion "from gripping and grasping more than 50 percent of a work day" [AR at 50], could not perform plaintiff's past work or any other jobs. The VE did not provide testimony as to whether an individual prohibited from "repetitive" gripping and grasping could do so. Under Gardner, limitations such as those posed to the VE may not have accounted for Dr. Ashley's limitation to no repetitive gripping and grasping. See Gardner, 257 Fed.Appx. at 30 & n. 5; see also Jacques v. Colvin, 2013 WL 812100, at *5 (C.D. Cal. Feb. 25, 2013) ("the Ninth Circuit has suggested ... that 'frequent' and 'repetitive' are not the same, and that a job could require repetitive activity occasionally"). Thus, there is no evidence in the record that plaintiff could perform her past relevant work, or any other work, if she had the RFC assessed by Dr. Ashley.

be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. See Benecke, 379 F.3d at 593-96.

Here, there is an outstanding issue that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, because the ALJ did not provide specific and legitimate reasons for rejecting plaintiff's treating physicians' opinions, the Court credits the opinions of Dr. Ashley and Dr. Giacobetti as a matter of law. See Widmark v. Barnhart, 454 F.3d 1063, 1069 (9th Cir. 2006) ("Because the ALJ failed to provide adequate reasons for rejecting [the examining physician]'s opinion, we credit it as a matter of law."); Edlund v. Massanari, 253 F.3d 1152, 1160 (9th Cir. 2001) (crediting, as a matter of law, improperly rejected treating physician opinions); see also Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990) (remanding for payment of benefits where the Commissioner did not provide adequate reasons for disregarding examining physician's opinion).

Next, the ALJ shall reconsider all of plaintiff's established limitations in making the RFC determination. Thereafter, with the assistance of a VE, the ALJ shall proceed through steps four and five to determine whether plaintiff can perform her past relevant work or any other work existing in significant numbers in the national economy.

/
/
/
/
/
/
/
/
/
/

## VII.

## **CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: August 8, 2014

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE